# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

JAMES ALFREDO CARTER,
         Petitioner,

v.                                                    Case No. 8:22-cv-25-KKM-LSG

SECRETARY, DEPARTMENT
OF CORRECTIONS,
         Respondent.
_____

## ORDER

James Carter, a Florida inmate, timely[1] filed a pro se Petition for Writ of Habeas

Corpus under 28 U.S.C. § 2254. (Doc. 1.) Having considered the petition, (*id.*), the

supporting memorandum of law, (Doc. 2), and the response in opposition, (Doc. 7), the

petition is denied.[2] Because reasonable jurists would not disagree, a certificate of

appealability also is not warranted.

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See* § 2244(d)(2). Carter's judgment and sentence were affirmed on appeal on October 3, 2018. (Doc. 7-2, Ex. 22.) His judgment became final 90 days later, on January 2, 2019, when the time to petition the Supreme Court of the United States for a writ of certiorari expired. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002). After 167 days of untolled time elapsed, Carter filed his state postconviction motion on June 19, 2019. (Doc. 7-2, Ex. 25.) That motion remained pending until the state appellate court issued the mandate on July 21, 2021. (Doc. 7-2, Ex. 34.) Another 167 days, for a total of 334 days of untolled time, ran before Carter filed his § 2254 petition on January 5, 2022. Carter's petition is therefore timely under the one-year limitation period.

[2] Carter did not file a reply.

## I.    PROCEDURAL BACKGROUND

A state court jury found Carter guilty of burglary of a dwelling with damage in excess of $1,000.00, first-degree arson, and aggravated stalking. (Doc. 7-2, Ex. 19.) Carter received a total sentence of twenty years in prison followed by ten years on probation. (*Id.*, Ex. 21.) The state appellate court per curiam affirmed the convictions and sentence. (*Id.*, Ex. 22.) Carter filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, followed by an amended motion. (*Id.*, Exs. 25 & 27.) The state court denied Carter's amended postconviction motion, and the state appellate court per curiam affirmed the denial of relief. (*Id.*, Exs. 30 & 31.)

## II.    FACTUAL BACKGROUND

### A. Overview and Trial Testimony[3]

Carter and Kiera Williams broke up in January 2015. (Doc. 7-2, Ex. 17, p. 262.) After the split, Williams moved in with her parents in Winter Haven, Florida. (*Id.*, pp. 262-64.) In March 2015, Williams obtained a temporary injunction for protection against Carter. (*Id.*)

On April 4, 2015, Williams's parents observed a burned area in their front yard. (*Id.*, pp. 156-57, 293-94.) Carter mentioned the burn mark to Williams over the phone

---

[3]This factual summary is based on the trial transcript.

and asked how the Williamses put it out. (*Id.*, pp. 264-66.) Carter also told Williams that if he could not have her, her parents could not have her. (*Id.*, p. 266.)

Three days after the Williamses discovered the burn mark, in the early morning hours of April 7, 2015, a fire broke out in the garage attached to their house. (*Id.*, pp. 158-60.) Williams and her parents safely evacuated the house, but the fire destroyed the garage and its contents and damaged the house's living room. (*Id.*, pp. 161-64.)

Detective Jeffrey Batz of the Florida State Fire Marshal's Bureau of Fire and Arson Investigations and Investigator Michael Steen of the Winter Haven Fire Department found burned debris from a small fire near a bush underneath a garage window. (*Id.*, pp. 191, 315, 317-19.) They concluded that a container with an ignitable liquid and an open flame was thrown or placed into the garage and on the hood of Williams's car. (*Id.*, pp. 199, 232, 320, 324-25.)

Detective Batz's canine sniffed a vehicle that belonged to Erlande Milord. (*Id.*, pp. 235, 170-71.) Milord testified that she let Carter borrow her car on the night of the fire and that Carter said he was going to Winter Haven. (*Id.*, pp. 170-71.) Detective Batz's canine alerted to the presence of an ignitable liquid in the area of the car's center console. (*Id.*, pp. 235-36.)

On April 8, 2015, the day after the fire, Detective Roderick Esteve of the Winter Haven Police Department called Carter and asked him to come to the police station. (*Id.*,

pp. 352-54.) Carter agreed and arrived at the station, where he was interviewed starting at 12:22 p.m. (*Id.*, pp. 354-55, 375.) Detective Esteve, Investigator Steen, and Winter Haven Fire Department Investigator Joseph Emery participated in the interview.

Carter stated that he had not driven Milord's car that week. (*Id.*, p. 388.) Carter also said that Williams mentioned the burned area in her family's yard to him, but he knew nothing about that incident. (*Id.*, pp. 390-91.) Carter indicated that he was in Auburndale or Lakeland on the night of the fire. (*Id.*, pp. 416-22, 429, 433-34.) After Carter discussed his relationship with Williams, Carter also stated that he had been shot in the shoulder at some point. (*Id.*, pp. 435-44, 469-70.)

Officers informed Carter that Williams suspected him of starting the fire at the garage and house, and that he would be looked at as the suspect. (Doc. 7-2, Ex. 18, pp. 364-65.) One of them told Carter that intent was "the biggest thing" about fire cases. (*Id.*, p. 369.) Carter was told that setting the fire with the intent to kill the house's occupants would be attempted first-degree murder and could result in a life sentence, but that setting the fire due to being mad or upset is "a whole different ball game," and that Carter had an opportunity to talk about his intent. (*Id.*, pp. 372-74.) The officer said that he did not believe that Carter intended to kill anyone. (*Id.*) When Carter asked if they were telling him that he needed to say he set the fire but did not intend to do harm, they responded that intent makes a difference and that he should only tell the truth. (*Id.*, pp. 393-94.)

Carter stated, "You['re] saying that . . . if I didn't do it, don't ever admit to something that's not the truth. . . . Ok. I'm not admitting to it." (*Id.*, pp. 395-96.) At certain points, Carter stated that he was done talking. (*Id.*, pp. 374, 378, 409-10.)

But Carter also made statements indicating that he was present at the Williams house and entered the house through the front door. (*Id.*, pp. 410-11, 421.) Officers told him that, according to the evidence at the scene, they knew that entry was not obtained through the front door. (*Id.*, pp. 410-12, 419, 421-22.) Near the end of the interview, Carter said that he "did it." (*Id.*, p. 435.) Carter stated that he entered the property through the driveway, went into the garage, took some "stuff," lit it, and put in on the car. (*Id.*, pp. 435-36, 441-43.)

When the interview ended at 3:00 p.m., Carter was arrested for violating the injunction for protection due to his contact with Williams. (Doc. 7-2, Ex. 17, pp. 359-60; Doc. 7-2, Ex. 18, p. 459.) He was placed into a holding cell at the police station. (Doc. 7-2, Ex. 17, pp. 359-60.) At about 5:30 or 6:00 p.m., when police were ready to transport him to jail, Carter told Detective Esteve that he wanted to talk more and tell him the whole story. (*Id.*, pp. 360, 366-67.) Detective Esteve started recording the second interview at 7:09 p.m. (Doc. 7-2, Ex. 18, p. 457.)

Detective Esteve gave Carter warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966). (*Id.*, pp. 458-59.) After stating that he understood his rights and agreeing to talk,

Carter signed a *Miranda* waiver form. (*Id.*, p. 459.) Carter told Detective Esteve that he believed the person who shot him was Williams's brother. (*Id*, pp. 462-63.) Carter stated that he went to Williams's house the night of the fire and that he wanted to get revenge and fight her brother. (*Id.*, pp. 464-65, 471-72.) Carter stated that he did not want to hurt anyone in the fire but wanted to "make a lot of smoke" so that they knew he was there. (*Id.*, p. 468.)

Carter said that he added gasoline he found in the garage to a partly filled water bottle. (*Id.*, p. 468.) Carter stated that he lit the bottle's contents and placed the bottle on a table near the window. (*Id.*, p. 468.) Carter said that the fire grew, but that he did not think the fire would get so big because the bottle also contained water. (*Id.*, pp. 468-69.) Carter reached for the bottle, which "hit [his] hand and just went wherever it went." (*Id.*, pp. 468-69.) Carter panicked and ran. (*Id.*, p. 469.) Carter admitted that he was driving Erlande Milord's car. (*Id.*, p. 471.)

Carter's defense was that he was coerced into giving a false confession and that Kiera Williams set the fire in a "scream for attention." (*Id.*, p. 585.) Williams testified that she was angry because while she and Carter were on an earlier break from their relationship, Carter had a brief relationship with another woman that resulted in the birth of a child. (Doc. 7-2, Ex. 17, p. 275.) Williams also admitted to Carter that she had burned herself with matches in her parents' home several times. (*Id.*, pp. 287-88.)

6

Dr. William Kremper, a clinical psychologist who interviewed Carter, testified for the defense. Dr. Kremper testified that Carter had a "low-average" IQ and had suffered from post-traumatic stress disorder, an adjustment disorder with mixed anxiety and depressed mood, dysthymia, and ADHD. (Doc. 7-2, Ex. 18, pp. 510-11.) Dr. Kremper testified that Carter showed elevations on testing scales related to hyperactivity or impulsivity and depression. (*Id.*, pp. 511-12.) Dr. Kremper testified that individuals exhibiting such characteristics are more susceptible to a coercive interrogation environment and that these characteristics are associated with false or unreliable confessions. (*Id.*, pp. 513-15.)

Dr. Kremper discussed the interview techniques used in this case. Dr. Kremper testified that interviewers gave Carter limited choices, repeatedly giving the impression that if he did not admit that he set the fire without intending to harm anyone, he would face more serious charges of attempted murder. (*Id.*, pp. 518-201.) Dr. Kremper testified that such interview techniques have led to many false confessions. (*Id.*, pp. 527-28.) He testified that here, when officers suggested they could testify to a lack of intent to kill anyone, "You want to comply. They have already convinced you . . . that they have . . . tons of evidence that you're guilty." (*Id.*, pp. 529-30.) When asked whether the interview techniques would affect the voluntariness of a statement, Dr. Kremper testified that the techniques used in

the first interview could have a "carryover" effect on voluntariness of any admissions in the second interview. (*Id.*, pp. 535-36.)

Carter testified at trial. He stated that in the first interview, he tried to figure out what officers wanted him to say. (*Id.*, p. 559.) Carter testified that he believed he would receive leniency if he stated that he did not mean to harm anyone. (*Id.*, p. 557.) He also testified that between the two interviews, Detective Esteve repeatedly came to the holding cell and asked if he had figured out his story. (*Id.*, pp. 562-63.) Carter thought the only way he would get out of the police station was to come up with a story. (*Id.*, p. 564.) Carter testified that he believed he had "no rights" before signing the *Miranda* waiver, so signing the *Miranda* waiver "meant nothing." (*Id.*, p. 564.) He also stated that he signed the waiver because he had to do what the detectives wanted. (*Id.*, pp. 564-65.) Carter denied setting the fires in the Williamses' front yard and in their garage. (*Id.*, pp. 565-66.)

## B. Pretrial Motion to Suppress Statements

Carter moved to suppress his statements to officers. He asserted that he was in custody without the benefit of *Miranda* warnings during his first interview. Carter also asserted that during the interview, police coerced him and made promises to him while ignoring his requests to end the interview and get an attorney. Carter argued that he involuntarily waived his *Miranda* rights at the start of his second interview.

After the state trial court denied Carter's motion, he moved for a rehearing. (Doc. 7-2, Ex. 9.) Carter asked the state court to consider the testimony of Dr. Kremper, who examined Carter twice after the suppression hearing. (Doc. 7-2, Exs. 9 & 10.) The state trial court denied the motion for rehearing, and recordings of both interviews were published at trial. (Doc. 7-2, Ex. 10.)

## III.    STANDARD OF REVIEW UNDER SECTION 2254

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The power of the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), the phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Id.* at 404. First, a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413.

Second, a decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to

obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). But the habeas court is "not limited by the particular justifications the state court provided for its reasons, and [it] may consider additional rationales that support the state court's determination." *Jennings v. Sec'y, Fla. Dep't of Corr.*, 55 F.4th 1277, 1292 (11th Cir. 2022). When the relevant state-court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192. The state may "rebut the presumption by showing

that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Id.*

For purposes of § 2254(d)(2), "it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.' " *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (quotations omitted). "An unreasonable determination of the facts occurs when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioners factual claim." *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1355 (11th Cir. 2020) (internal quotation marks and alterations omitted). A state court's findings of fact are presumed correct, and a petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even where a petitioner succeeds in rebutting the presumption, he must show that the state court's decision is "based on" the incorrect factual determination. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022). This is because a state court decision may still be reasonable "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id.* (quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring)).

12

In addition to satisfying the deferential standard of federal court review of a state court adjudication, a federal habeas petitioner must exhaust his claims by raising them in state court before presenting them in a federal petition. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). A petitioner satisfies this exhaustion requirement if he fairly presents the claim in each appropriate state court and alerts that court to the federal nature of the claim. *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A petitioner shows cause for a procedural default when he demonstrates "that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). "A 'fundamental miscarriage

of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.*

## IV.    STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL

Carter brings claims for ineffective assistance of trial counsel. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id.* at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id.* at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on

14

the judgment." *Id.* at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.' " *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## V.   ANALYSIS

### A. Ground One

Carter asserts that the state trial court erred in denying his motion to suppress his statements to officers. Carter alleges violations of his Fifth Amendment right to remain silent, his Sixth Amendment right to a fair trial, and his Fourteenth Amendment right to due process.

15

Respondent contends that Carter's claim is unexhausted because he did not present the claim's federal component on appeal. *See Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1342 (11th Cir. 2007) (stating that a petitioner must "make the state court aware that the claims asserted present federal constitutional issues"). When Carter challenged the state trial court's decision on direct appeal, he did not specifically allege a violation of his federal constitutional rights. (Doc. 7-2, Ex. 23, pp. 16-31.) He referred to *Miranda* warnings, noted that the Florida Supreme Court has stated that *Miranda* warnings are required under both the Florida and United States Constitutions, and cited one federal decision for the proposition that *Miranda* applies to the functional equivalent of a custodial interrogation. (*Id.*) But Carter otherwise relied on Florida law. (*Id.*)

Fairly presenting a federal claim to a state court requires more than making superficial references to federal law. *McNair v. Campbell*, 416 F.3d 1291, 1302-04 (11th Cir. 2005). In *McNair*, the petitioner did not fairly present his federal claim when he only cited one federal decision in a string of cases and referred to federal constitutional amendments in the conclusion of his argument. *See id.* at 1303-04. Those references to federal law were "exactly the type of needles in the haystack that [the Eleventh Circuit has] previously held are insufficient to satisfy the exhaustion requirement." *Id.* at 1303.

Merely implying a federal claim is insufficient to satisfy § 2254(b). A claim is not fairly presented if the state court "must read beyond a petition or brief . . . that does not

alert it to the presence of a federal claim." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004); *see also Zeigler v. Crosby*, 345 F.3d 1300, 1308 n.5 (11th Cir. 2003) (stating that the mere assertion that a defendant "was denied due process and a fair trial" is "insufficient to present" a federal claim because "this language could just be asserting a fair trial claim under the Florida Constitution and Florida's Due Process Clause").

Despite Carter's failure to fairly present a federal claim on direct appeal, his federal claim is technically exhausted. State-court remedies are exhausted "when they are no longer available, regardless of the reason for the unavailability." *Shinn v. Ramirez*, 596 U.S. 366, 378 (2022) (quoting *Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006)). But any federal claim Carter now raises is procedurally defaulted because it was "not presented to the state courts 'consistent with [the State's] own procedural rules' " requiring the claim to be brought on direct appeal. *Ramirez*, 596 U.S. at 378 (quoting *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000)). Carter does not establish that an exception applies to excuse the procedural default.

Alternatively, even assuming that Carter fairly presented his federal claim on direct appeal, he is not entitled to relief because he has not shown that the state court unreasonably denied his claim. *Miranda* holds that, under the Fifth Amendment, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444.

17

Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.*; *see also United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) ("A defendant is in custody for the purposes of *Miranda* when there has been 'a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' " (quoting *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006))).

To determine whether a suspect was in custody, a court examines the totality of the circumstances surrounding the interrogation. *Stansbury v. California*, 511 U.S. 318, 322 (1994). A court considers "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted). A court must consider "whether the circumstances of the interview "present[ ] the same inherently coercive pressures as the type of station house questioning in *Miranda*." *Howes v. Fields*, 565 U.S. 499, 509 (2012). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996).

*Miranda* also is required when a person is subject to the functional equivalent of custodial interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). Thus, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. But the Fifth Amendment does not bar a defendant's volunteered statements. *See Miranda*, 384 U.S. at 478. A court is therefore not required to suppress "remarks which are not a product of interrogation." *United States v. Hall*, 716 F.2d 826, 830 (11th Cir. 1983).

Carter argues that the state court should have suppressed his statements from the first interview because he was in custody without the benefit of *Miranda* warnings. He also argues that suppression was warranted because officers made coercive threats and promises to him and ignored his requests to stop talking and to get a lawyer.

Carter has not shown that the state court unreasonably denied his motion to suppress his statements made during the first interview. The state court found that Carter was not in custody. (Doc. 7-2, Ex. 8, doc. pp. 319-20.) The state court found that Carter voluntarily traveled to the police station to talk to police and was not forced, coerced, or threatened to do so. (*Id.*, doc. pp. 318-20.) The state court found that Carter was told that he was not under arrest and that he was free to leave, that there was no indication he could

not leave. (*Id.*) The state court also concluded that the interview was conducted in a non-coercive manner and that the police station setting did not render it custodial. (*Id.*)

The state court further found that "nothing transpired during the interview that would have required the detectives to advise [Carter] of his *Miranda* rights." (*Id.*, doc. p. 320.) The state court found that, although Carter indicated that he might not want to talk anymore, he kept talking to officers. (*Id.*, doc. pp. 320-21.) The state court also found that even though Carter asked about getting a lawyer, when police "appropriately responded that if that was [Carter's] desire then the interview would end," Carter indicated that he did not want to end the interview. (*Id.*) Further, the state court found, "the detectives were not engaged in a custodial interview at the time of [Carter's] comment regarding a lawyer." (*Id.*, doc. p. 321.)

Carter has not shown that the state court unreasonably denied his motion to suppress the statements made during the first interview. First, the circumstances and setting of the interview did not render it custodial. Testimony from the suppression hearing reflects that when Detective Esteve called Carter, Carter was cooperative and agreed to come to the station to talk about the incident at the Williams home. (Doc. 7-2, Ex. 7, pp. 47-48.) Carter transported himself to the station. (*Id.*, p. 48.) He was taken to an interview room, where he was told that he was not under arrest and that he was free to leave. (*Id.*, p. 48; Doc. 7-2, Ex. 2, p. 3.) Inspector Steen described Carter as "[p]retty relaxed and

talkative" and stated that Carter never tried to leave the interview room. (Doc. 7-2, Ex. 7, p. 28.) Detective Esteve testified that the doors were unlocked. (*Id.*, p. 49.) Thus, the record supports the conclusion that there was no significant restraint on Carter's freedom of movement comparable to an arrest that resulted in Carter's being in custody.

Second, Carter does not show that his statements should have been suppressed due to his requests to stop talking and to obtain a lawyer. As the state court noted, although Carter did make some remarks about being done with talking, he continued to speak to officers. And when Steen stated that the interview would be over and he would leave the room after Carter asked about getting "a lawyer or something," Carter stated that he did not "want to do that." (Doc. 7-2, Ex 2, pp. 132-33.) As addressed, *Miranda* does not compel the exclusion of voluntary statements. 384 U.S. at 478. The record supports the finding that Carter voluntarily continued with the interview, despite his statements about being done talking and getting a lawyer. Moreover, *Miranda* rights cannot be invoked anticipatorily. *See Bobby v. Dixon*, 565 U.S. 23, 28 (2011) (stating that the Supreme Court "has never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than custodial interrogation").

Finally, Carter has not shown that the state court unreasonably concluded that "nothing transpired during the interview that would have required the detectives" to give him *Miranda* warnings. Carter argues that he was threatened with a life sentence if he did

21

not disclose his intention in setting the fire. He appears to argue that these alleged threats were coercive enough to make the interview equivalent to custodial interrogation and to cause him to make involuntary statements.

Carter has not shown that the state court unreasonably denied his claim. The record supports the conclusion that officers were informing Carter of a possible outcome if he was charged with attempted murder and a jury thought he intended to kill the Williamses in the fire. *See, e.g., United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990) (stating that discussions of realistic penalties and encouragement to tell the truth do not amount to unlawful inducements). Further, even after these remarks about a possible life sentence, Carter still denied involvement in the fire. (Doc. 7-2, Ex. 2, pp. 80-84, 98-99.)

Carter also argues that he was promised law enforcement officers would provide helpful testimony if he confessed to setting the fire but maintained that he not intend to harm anyone. Conduct that is coercive enough to render statements involuntary "normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do, or the making of a promise that induces a confession." *United States v. Lall*, 607 F.3d 1277, 1286 (11th Cir. 2010) (quoting *United States v. Thompson*, 422 F.3d 1285, 1295-96 (11th Cir. 2005)). In other words, "certain promises, if not kept, are so attractive that they render a resulting confession involuntary. . . . A promise of immediate release or that any statement will not be used against the accused is

such a promise." *Lall*, 607 F.3d at 1286 (quoting *Streetman v. Lynaugh*, 812 F.2d 950, 957 (5th Cir. 1987)).

During the interview, Carter indicated that he set the fire and that he entered the home's front door. But Investigators Steen and Emery stated that his statement about the front door conflicted with evidence from the scene. They discussed with Carter what would happen when if they were called to testify about the fire. They explained that they could not testify consistently with any of Carter's statements that were inconsistent with evidence. For instance, officers told him:

> I would testify as to how I know the fire occurred, how can I prove that how [sic] it occurred and why. In that statement then, I would say, "Your Honor, it's pretty obvious to me as a fire investigator that he wasn't trying to kill anybody, whoever it was. It wasn't that he was trying to kill person, the people, because it was set in this manner, of where it was set and all that.
>
> As you know, okay, and if you try to just say some BS like, "Come through the front door," how can I even prove that? I couldn't. . . .

(Doc. 7-2, Ex. 2, pp. 117-18.)

> [M]y point is if you try to say that, then there's nothing I can do for you. Absolutely nothing I can do for you.
>
> The best thing that I can do for you . . . is for me to say whether you tried to kill them people or not. Because, brother, that is like huge.

(*Id.*, pp. 123-24.)

> I'm not going to accept that. We're not going to accept that. I'm not going to go to court and play like you said. You lied. I'm not going to go before a judge and say that. That's what I told you. . . . I'm not here to try to get you on something you didn't do. Do you realize that?

> I'm only . . . the only thing that we're trying to get from you is to speak the truth of the intent, because that makes the difference on prison or not.

(*Id.*, p. 132.)

Carter has not shown that the state court unreasonably denied his claim. The officers discussed their potential testimony at a future court proceeding, and they informed Carter that they might be able to testify to his lack of intent to harm if he gave truthful information to that effect. Carter has not shown that the officers made any promise to take illegitimate action. *See, e.g.*, *United States v. Chavez*, No. 22-20105-CR, 2022 WL 19762142 (S.D. Fla. Nov. 3, 2022) (stating that a petitioner "must show that he was subjected to threats or promises of illegitimate action" in order to render his confession involuntary (quoting *Kent v. United States*, 272 F.2d 795, 799 (1st Cir. 1959))); *see also United States v. Hipp*, 644 F. App'x 943, 948 (11th Cir. 2016) (stating that an officer telling a suspect that he "should tell the truth and that cooperating with the government would be in his best interest" went to giving the suspect information to make an informed decision about cooperation).

24

Carter has not shown, under the demanding AEDPA standard, that the state court's denial of his motion to suppress the first interview was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable factual determination. But even if this can be said to be a promise made to induce incriminating statements sufficient to characterize the statements as involuntary, Carter is not entitled to relief.

Even assuming that Carter's first interview should have been excluded as having been obtained in violation of his constitutional rights, Carter still fails to show entitlement to federal habeas relief. Any constitutional error in admitting Carter's first interview must be considered under the harmless error test articulated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Federal habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' " *Id.* at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)). To find actual prejudice, a federal habeas court must conclude that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

Carter cannot meet this standard because his second interview, which contained incriminating statements explaining how he entered the garage and started the fire, was properly admitted. Carter argues that his *Miranda* waiver was involuntary because it was

25

tainted by the allegedly coercive nature of the first interview. The state court rejected Carter's argument, finding that Carter "was properly advised of his *Miranda* rights prior to the [second] interview and . . . knowingly and voluntarily waived his *Miranda* rights." (Doc. 7-2, Ex. 8, doc. p. 321.)

Carter has not shown that the state court's decision was unreasonable. "The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). The voluntariness of a *Miranda* waiver "has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Id.* A court analyzing the voluntariness of a *Miranda* waiver applies a two-part inquiry. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). And, second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* A court's decision is based on the totality of the circumstances. *Id.*

Carter has not shown that the state court unreasonably rejected his argument that a "carryover" effect from alleged police coercion in his first interview, which ended at about 3:00 p.m. caused him to involuntarily waive *Miranda* before his second interview at about 7:00 p.m. Detective Esteve testified at the suppression hearing that Carter said that he

wanted to tell Detective Esteve what happened. (Doc. 7-2, Ex. 7, pp. 51-52.) Carter agreed that nobody threatened him or coerced him into approaching Detective Esteve. (Doc. 7-2, Ex. 18, pp. 457-58.) Carter stated that no one forced him or made him any promises, and Carter stated that he understood his *Miranda* rights. (*Id.*, pp. 458-59.) He stated that it was true that he agreed to make a statement, that no promises or threats had been made, and that no pressure of any kind had been used against him. (*Id.*, p. 459.) Carter also signed a waiver of rights form. (Doc. 7-2, Ex. 7, pp. 52-53.) The record supports the conclusion that Carter understood his rights and the consequences of waiving them, and that he made a free and voluntary choice to waive his rights and speak with Detective Esteve. Carter does not show that the state court unreasonably concluded that he voluntarily waived his *Miranda* rights and spoke to police.

Thus, Carter fails to show that the state court's rejection of his challenge to the second interview's admissibility was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable factual determination. And since he has not established constitutional error in the trial court's admission of his second statement, Carter also fails to show actual prejudice under *Brecht* even if the first interview should have been excluded.

Finally, Carter argues for the first time that his statements made in the second interview should have been suppressed under *Missouri v. Seibert*, 542 U.S. 600 (2004).

27

Although this aspect of Carter's claim is procedurally defaulted because he did not present it in state court, it would afford Carter no relief notwithstanding the default. Under *Seibert*, if police deliberately withhold *Miranda* warnings during a custodial interrogation and elicit a confession (which confession is generally inadmissible), then provide *Miranda* and again obtain a confession, the second, post-*Miranda* confession is also inadmissible. *Id.* at 604. This sort of "midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda*'s constitutional requirement. . . ." *Id.*

Carter's case is distinguishable from *Seibert*. As addressed, Carter has not shown that his first interview was custodial. Thus, he cannot show that police intentionally withheld *Miranda* warnings during a time when the warnings were mandated. And it was not until several hours later that Carter began another conversation by telling Detective Esteve that he wanted to talk. Thus, Carter has not shown that he received a "midstream" warning during a custodial interrogation. As addressed, prior to the second interview, Carter denied that any pressure, threats, coercion, or promises were utilized. (Doc. 7-2, Ex. 18, pp. 457-59.) Carter fails to show that, contrary to *Seibert*, officers deliberately circumvented *Miranda* warnings to obtain a confession. Carter is not entitled to relief on Ground One.

## B. Grounds Two and Three

In Ground Two, Carter contends that the state trial court erred in denying his motion for a rehearing of his motion to suppress. Carter argues in Ground Three that the state trial court erred by not allowing Dr. Kremper to testify at trial to his opinion about the voluntariness of Carter's *Miranda* waiver. Carter alleges violations of his Sixth and Fourteenth Amendment rights.

Respondent correctly asserts that Carter did not exhaust his federal claims in state court. When Carter appealed the trial court's rulings on the motion for rehearing and the admissibility of Dr. Kremper's testimony, he did not allege a violation of his federal rights, mention federal law, or cite any federal decisions. (Doc. 7-2, Ex. 23, pp. 32-36.) His argument relied only on state law. (*Id.*) Carter failed to fairly present his federal claims to the state appellate court.

Carter cannot return to state court to present the federal claims in a second direct appeal. *See* Fla. R. App. P. 9.140(b)(3) (stating that a notice of appeal must be filed within 30 days of the rendition of a written sentence). Thus, while Carter's federal claims are considered exhausted, they are procedurally defaulted because they were not presented to the state court on direct appeal under Florida's established appellate review system. *See Dunn v. State*, 282 So.3d 899, 902 (Fla. 1st DCA 2019) ("[C]laims of trial court error . . . must be raised on direct appeal." (citations omitted)). Carter has not established that an

29

exception applies to overcome the procedural default. Accordingly, Grounds Two and

Three warrant no relief.

## C. Ground Four

Carter argues that trial counsel was ineffective for not moving to continue the

suppression hearing to call Dr. Kremper. Carter asserts that if the trial court had heard Dr.

Kremper's testimony, his motion to suppress would have been granted and the outcome of

trial would have been different.

The state court found that counsel did not perform deficiently. (Doc. 7-2, Ex. 30,

doc. pp. 1749-50.) The state court referred to counsel's statements at a hearing on Carter's

motion for a rehearing of his motion to suppress. Counsel addressed her decision not to

seek a continuance of the suppression hearing. Counsel stated that she talked to Dr.

Kremper before filing the suppression motion and thought he could evaluate Carter before

the suppression hearing. (Doc. 7-2, Ex. 10, p. 5.) Due to scheduling difficulties, counsel

stated, Dr. Kremper could not evaluate Carter until after the suppression hearing. (*Id.*)

Counsel told the trial court that she considered delaying the suppression hearing

until after Dr. Kremper evaluated Carter. (*Id.*) But counsel stated that Carter "wanted to

. . . move as fast as we could in regards to this Motion to Suppress. . . . [H]e wanted to get

this behind him and get out . . . and so forth." (*Id.*, pp. 5-6.) Counsel stated that when she

filed the initial motion to suppress (which she later amended), Carter had not wanted to

waive his right to a speedy trial. (*Id.*, p. 4.) Counsel explained that because Carter maintained his innocence, "any amount of time" in custody "is a deprivation to him. It is very difficult for him." (*Id.*) Counsel also stated that when Carter met with Dr. Kremper, Carter expressed his belief that the suppression motion was a "slam dunk." (*Id.*, p. 6.)

The state postconviction court found that, under these circumstances, counsel made a reasonable decision to proceed with the suppression hearing rather than move for a continuance. (Doc. 7-2, Ex. 30, doc. p. 1750.) Carter has not shown that the state court's ruling was unreasonable. As counsel stated, the speedy trial period had not run when she filed the initial motion to suppress. Carter was arrested on April 8, 2015, and counsel filed the motion 156 days later, on September 11, 2015. (Doc. 7-2, Ex. 4); *see* Fla. R. Crim. P. 3.191(a) (providing that the State must bring a defendant to trial within 175 days of arrest for a felony charge).

Even if preserving speedy trial was no longer a consideration by the time the motion to suppress was heard,[4] counsel knew that Carter wanted to move forward as quickly as possible because of the difficulties of being in custody. Carter does not contest counsel's representation that he wished to proceed with his case as fast as possible. Nor does he challenge counsel's statement that he thought he would prevail on his suppression motion.

---

[4] The hearing took place on December 18, 2015. (Doc. 7-2, Ex. 7.) The docket sheet includes an entry on November 3, 2015 that reads "demand for speedy trial," but does contain any notations about a waiver of speedy trial. (Doc. 7-2, Ex. 1, p. 6.)

A criminal defendant, not his counsel, is "the master of the defense" with "a broad power
to dictate the manner in which he is tried." *Mulligan v. Kemp*, 771 F.2d 1436, 1441-42
(11th Cir. 1985). The record shows that counsel considered delaying the suppression
proceedings to call Dr. Kremper but decided not to do so because Carter wanted to move
the case forward. Under the circumstances, the state court did not unreasonably conclude
that Carter failed to establish deficient performance of counsel.

Carter contends in his § 2254 petition that he never insisted on enforcing his right
to a speedy trial and notes that the speedy trial time had expired when the suppression
hearing was held. But Carter did not raise these allegations in his postconviction motion.
(Doc. 7-2, Ex. 27, pp. 12-13.)[5] Carter cannot allege new supporting facts in his § 2254
petition. *See Green*, 28 F.4th at 1135 (stating that "[p]resentation of a claim under the
same general legal umbrella but with entirely different factual underpinnings . . . does not
constitute fair presentation" of the claim (internal quotation marks and citation omitted));
*McNair*, 416 F.3d at 1302 ("While we do not require a verbatim restatement of the claims
brought in state court, we do require that a petitioner presented his claims to the state court
'such that a reasonable reader would understand each claim's particular legal basis and

---

[5] Carter's postconviction motion did not clearly allege that he insisted on a speedy trial. He only alleged
that counsel "used the excuse" that he did not want to waive his speedy trial right and that an attorney "may
waive speedy trial without consulting the client and even against the client's wishes." (Doc. 7-2, Ex. 27, pp.
12-13.)

specific factual foundation.' "(quoting *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004))).

Further, contrary to his assertion, the state court docket sheet does indicate that Carter intended to seek a speedy trial as late as November 2015. (Doc. 7-2, Ex. 1, p. 6.) And, as addressed above, even if the speedy trial period had expired at the time of the hearing, Carter does not challenge counsel's statements that he still wanted to move forward with his case as quickly as possible and that he believed that his statements would be suppressed.

Carter has not shown that the state court's decision involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination. He is not entitled to relief on Ground Four.

## D. Ground Five

Carter contends that trial counsel was ineffective for not striking a juror who was recently divorced after being in an abusive marriage for thirteen years. Carter contends that the juror was "inherently biased" because Carter's case involved domestic issues. (Doc. 1, p. 27.)

During voir dire, when the prosecutor asked if any of the prospective jurors or their family members had experienced domestic violence, the juror answered:

[A]: Yes. My ex-husband was abusive, and we just divorced. It was final in June. And it's 13 years of abuse, but I'm okay by the grace of God, and I don't think it will affect me, but you asked about domestic violence.

[Q]: Certainly. So you - - you believe, even with all that, that you can be fair and impartial in this case?

[A]: Oh, yeah.

(Doc. 7-2, Ex. 16, p. 38.)

Later, the juror answered the prosecutor's question of whether she believed she would be a good juror:

[A]: I do.

[Q]: Can you be fair and impartial?

[A]: I will.

[Q]: And why do you believe you think you'd be a good juror?

[A]: Because I get a lot of practice of listening to the whole story.[6]

[Q]: And anything about the charges cause you any concern?

[A]: No.

(*Id.*, p. 51.)

The state court denied Carter's claim, finding that the juror "was unequivocal in her assertions that she could set her personal experience with domestic violence aside and be

---

[6] This reference to having "a lot of practice of listening to the whole story" was not explained further. But the juror later said that she worked as a manager at her place of employment. (Doc. 7-2, Ex. 16, p. 73.)

fair and impartial." (Doc. 7-2, Ex. 28, p. 2.) The state court concluded that because Carter thus failed to show that an actually biased juror was seated, he also failed to show that counsel's performance prejudiced him. (*Id.*)

The state court's ruling was reasonable. As the state court noted, Carter must show that an actually biased juror was seated to demonstrate prejudice. *See Rogers v. McMullen*, 673 F.2d 1185, 1189 (11th Cir. 1982) (stating that a defendant's Sixth Amendment right to a fair and impartial jury is not violated unless the defendant can show that a member of the jury which heard his case was biased).

The juror's voir dire responses reflect her ability to be fair and impartial. The jury was also instructed to base its decision only upon the evidence and the law as stated by the court. (Doc. 7-2, Ex. 18, p. 618.) The jurors are presumed to follow the trial court's instructions. *See Jamerson v. Sec'y, Dep't of Corr.*, 410 F.3d 682, 690 (11th Cir. 2005) (stating that courts "presume that juries follow instructions" (citing *Stevens v. Zant*, 968 F.2d 1076, 1086 (11th Cir. 1992))).

Carter does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim. He is not entitled to relief on Ground Five.

### E. Ground Six

Carter argues that trial counsel was ineffective for not moving to dismiss count one (burglary of a dwelling with damage over $1,000.00) because it was enhanced by count two (arson). He contends that the damage was only over $1,000.00 because the damage was caused by the fire that was the subject of the arson charge.

Respondent correctly asserts that Carter did not raise this claim of ineffective assistance of counsel in his postconviction motion. Carter brought a substantive double jeopardy claim arguing that his convictions for both counts could not stand. (Doc. 7-2, Ex. 27, pp. 19-21.) But his substantive double jeopardy claim was insufficient to fairly present a related ineffective assistance of counsel claim. *See LeCroy v. Sec'y, Fla. Dep't of Corr.*, 421 F.3d 1237, 1260 n. 24 (11th Cir. 2005) (noting that a substantive claim was "separate and distinct" from an ineffective assistance claim based on the substantive claim); *Bailey v. Nagle*, 172 F.3d 1299, 1304 n.8 (11th Cir. 1999) ("An ineffective-assistance claim is analytically distinct from the substantive claim underlying it.").

Carter cannot present the ineffective assistance claim in an untimely, successive postconviction motion. *See* Fla. R. Crim. P. 3.850(b), (h). His ineffective assistance claim, while technically exhausted, is therefore procedurally defaulted. *Ramirez*, 596 U.S. at 378. Carter does not argue that an exception applies to overcome the default. He is not entitled to relief on Ground Six.

36

### F. Ground Seven

Carter asserts that he is entitled to relief based on the cumulative effect of trial counsel's alleged deficiencies. The state court denied this claim because none of Carter's individual claims had merit. (Doc. 7-2, Ex. 30, doc. p. 1751.) Carter fails to show that this decision was unreasonable. A cumulative error claim must fail when none of the "individual claims of error or prejudice have any merit." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). Because each individual claim of error lacks merit, Carter has not shown that the state court unreasonably denied his cumulative error claim.

## VI.    CERTIFICATE OF APPEALABILITY

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Carter must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Carter has not made the requisite showing. Finally, because Carter is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that Carter's Petition for Writ of Habeas Corpus, (Doc. 1), is **DENIED**. The **CLERK** is directed to enter judgment against Carter and in Respondent's favor and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on March 20, 2025.

Kathryn Kimball Mizelle
United States District Judge